**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY L. BERLENER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-cv-1300-DDN |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Timothy Lee Berlener for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on August 22, 1961. (Tr. 147.) He filed his application for disability insurance benefits on June 27, 2011. (Tr. 78.) He initially alleged an onset date of his disability of June 1, 2009 (Tr. 147), but amended it to July 1, 2011. (Tr. 34-35, 185.) He alleges disability due to back problems, manic depression, bipolar disorder, narcolepsy, short-term memory problems, and attention deficit hyperactivity disorder (ADHD).[1] (Tr. 203.) His application was denied initially (Tr. 90-95), and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 96-97.)

---

[1] Plaintiff was diagnosed initially as having attention deficit disorder (ADD). However, this term is now out of date, and instead is called attention deficit hyperactivity disorder (ADHD). Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 59 (5th ed. 2013).

On April 9, 2013, following a hearing, the ALJ issued a decision denying plaintiff's application. (Tr. 7-27.) The Appeals Council denied review on June 9, 2014. (Tr. 1-3.) Thus, the decision of the ALJ is the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On June 4, 1981, plaintiff was admitted to Barnes Hospital for treatment of a closed head injury from a motorcycle accident. (Tr. 301-04.) Six days later, on June 10, 1981, a repeat computed tomography (CT) scan showed "some degree of cerebral atrophy." (Tr. 305.) Plaintiff recovered from this trauma and, according to his testimony, was employed for thirty years following the accident as a hod carrier.[2] (Tr. 38.)

Ten years after his motorcycle accident, starting March 16, 1991, Farida Farzana, M.D., began to intermittently treat plaintiff with regard to his ADHD. According to the record, plaintiff saw Dr. Farzana 33 times from 1991 through 2012. Dr. Farzana initially prescribed Desoxyn from the initial consultation until 2011. Beginning in 2010, Dr. Farzana began to prescribe plaintiff Adderall for the management of his ADHD. Moreover, during the years he treated plaintiff, Dr. Farzana noted plaintiff's GAF.[3] These GAF scores ranged from as high as 51[4] and as low as 31.[5] (Tr. 256-70, 565-83, 585-601.)

---

[2] A mason's assistant whose work is to carry hods of materials to the mason. Hod Carrier Definition, Dictionary.com, http://dictionary.reference.com/browse/hod%20carrier?s=t (last visited June 18, 2009).

[3] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) (DSM IV).

[4] A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM IV at 34.

[5] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM IV at 34.

Then, on January 21, 2003, plaintiff was seen and treated for low back pain. He was prescribed OxyContin and Percocet, and also given an epidural steroid injection. The steroid injection was effective for a short period of time. (Tr. 428.)

Later, on December 1, 2007, plaintiff was admitted to St. Joseph Health Center-Wentzville, where he was diagnosed with depression secondary to chronic pain. He was tried on regimes of Xanax, Zoloft, and Cymbalta until he was stabilized. On discharge, his GAF was recorded at 54. (Tr. 533-41.)

On March 26, 2008, plaintiff had a sleep study performed by Howard E. Goldberg, M.D., F.C.C.P, which showed moderate obstructive sleep apnea primarily due to frequent respiratory events in REM sleep. (Tr. 300.) He had a second sleep study done April 4, 2008, which, again, showed moderate obstructive sleep apnea. It was recommended that he begin Continuous Positive Airway Pressure (CPAP) therapy. (Tr. 299-300.)

On August 7, 2008, plaintiff began semi-regular treatment by Kinim I. Smith, M.D., at North Missouri Rheumatology. According to the record, plaintiff saw Dr. Smith 44 times from 2008 until November 3, 2011. Dr. Smith regularly diagnosed chronic back pain, ADHD, anxiety, and depression. During these visits Dr. Smith prescribed methadone for plaintiff's chronic back pain, Adderall for plaintiff's ADHD, and Xanax for plaintiff's anxiety. Dr. Smith recorded plaintiff's pain level during these appointments and they ranged from as high as "10+" to as low as "2" with medication. However, it appears that with proper adhesion to the methadone, plaintiff was able to work and manage his pain. (Tr. 316-402.)

Plaintiff reported to St. Joseph Hospital-Wentzville March 20, 2009, due to a car accident stemming from plaintiff falling asleep at the wheel. (Tr. 453.) Following the accident plaintiff underwent a series of X-rays. The X-ray of the cervical spine showed no acute fracture or dislocation of the cervical spine, and mild cervical spondylosis from C5-C8. The X-ray of the thoracic spine showed no acute fracture or dislocation of the thoracic spine, and mild lower thoracic spondylosis most prominent at T9-T10. Lastly, plaintiff's Radionuclide Bone Scan showed an acute fracture of the sternum and degenerative pattern of mildly increased activity in both shoulders. (Tr. 725-27.)

On February 1, 2010, plaintiff was treated at Lincoln County Medical Center for symptoms of anxiety. He was prescribed Xanax and discharged with instructions for re-evaluation and further treatment by his primary doctor. (Tr. 734.)

On April 11, 2010, plaintiff was again seen at Lincoln County Medical Center complaining that he was stressed out with abdominal pain at no specific site. He was prescribed Xanax and discharged. (Tr. 741.)

On September 27, 2010, plaintiff was treated at Lincoln County Medical Center for atypical chest pains. He was prescribed Prilosec and Vicodin and discharged to home. He was instructed to follow up with a pain management doctor within five days. (Tr. 799.)

Beginning in the first quarter of 2011, and continuing at least until the first quarter of 2012, plaintiff collected unemployment compensation benefits. (Tr. 171-74.)

On April 18, 2011, Dr. Smith treated plaintiff. The doctor's report noted that plaintiff had acknowledged that he had been in jail for "taking too many controlled substances." Dr. Smith then indicated that, "[e]ver since I started to see [plaintiff] I've never seen him overusing his meds. Never using marijuana or any other drugs than Rx drugs." (Tr. 363.)

On September 9, 2011, plaintiff began seeing Joy C. Stowell, M.D., regarding his low testosterone levels. Dr. Stowell diagnosed him with testosterone deficiency and began him on a regimen of Androgel. According to the record, Dr. Stowell treated plaintiff roughly every three months from 2011 through 2013 regarding his testosterone deficiency and for general examinations. Dr. Stowell noted that plaintiff "has chronic slurring of his words related to his traumatic brain injury, cognitive disorder." (Tr. 620-721.)

On October 11, 2011, plaintiff had a consultative evaluation (CE) with Gary W. Rucker, D.O. Dr. Rucker noted plaintiff had some muscle tenderness and possible mild spasms, but a normal gait without an assistive device, plaintiff was able to walk on heels and toes, and had negative straight leg raising both sitting and supine. He had some decreased range of motion in his back but had very good upper body strength and generally his ranges of motion were normal. Dr. Rucker stated that plaintiff would have trouble in his previous line of work as a hod carrier and that his ADHD and short-term memory loss might be a problem in some other occupations. However, Dr. Rucker explained that plaintiff should be "OK" handling objects, sitting for 30-40 minutes and walking for 15 minutes. (Tr. 271-82.)

On November 22, 2011, plaintiff had an X-ray taken at Pike County Memorial Hospital. The X-ray showed very minimal degenerative changes in the lumbar spine. There were no visualized fractures or acute osseous findings. (Tr. 404.)

On December 7, 2011, Stanley Hutson, Ph.D., completed and submitted a Psychiatric Review Technique Form and a Residual Functional Capacity (RFC) assessment. Dr. Hutson reviewed the medical evidence prior to this date and determined that plaintiff "has the ability to understand and remember simple instructions, remember work procedures, and make simple work decisions." Dr. Hutson further wrote, "[h]e can complete routine tasks and complete a work week." Dr. Hutson concluded his assessment by indicating that although plaintiff can respond to supervision appropriately, he would benefit from limited social interaction with coworkers or the public. (Tr. 405-19.)

On January 16, 2012, Dr. Farzana completed a Mental Residual Functional Capacity Assessment. He, again, gave plaintiff a diagnosis of ADHD. He listed plaintiff's symptoms as hyperactivity, restlessness, and distractibility. He also noted that plaintiff's symptoms were worse without his medication. (Tr. 585-88.)

On February 13, 2012, plaintiff had an additional sleep study performed at Lincoln County Medical Center. The study showed only mild obstructive and central sleep apnea. (Tr. 627.)

On March 5, 2012, Dr. Stowell noted in her notes that plaintiff's attorney "is wanting me to change his disability form saying he never lifts over 20 pounds. This is not accurate." (Tr. 693.)

On March 16, 2012, Dr. Smith completed a RFC Questionnaire for plaintiff and provided an opinion as to how plaintiff's impairments may affect his ability to sustain employment. He opined that plaintiff's attention span is severely limited and that without medication he would not be able to focus. (Tr. 862-66.)

On March 27, 2012, Dr. Farzana "kept repeating" that he should not continue to drive a car. Dr. Farzana wrote, "[plaintiff] is taking a lot of medications which could interfere in his driving." (Tr. 600.)

On April 23, 2012, Min Pan, M.D., treated plaintiff at Metropolitan Neurology to address his short-term memory loss. Dr. Pan's physical examination of plaintiff revealed a normal appearance and no apparent distress. Dr. Pan indicated that plaintiff had short-term memory difficulty. However, she suspected plaintiff did not "make efforts to some of the questions." She declined to fill out a disability paper until receiving the results of the neuropsychological evaluation. (Tr. 602-03.)

On May 14, 2012, plaintiff saw Michael V. Oliveri, Ph.D., for the neuropsychological examination Dr. Pan had previously recommended. The evaluation consisted of a review of some of plaintiff's records, a clinical interview, and some standardized testing. Dr. Oliveri determined that plaintiff had an IQ of 79 with a limited vocabulary. He further stated that, in the absence of structure and when placed under time pressure or placed in novel circumstances, plaintiff was not a candidate for independent work. It was Dr. Oliveri's impression that plaintiff had a moderate neurocognitive disorder due to a traumatic brain injury. He wrote that plaintiff is not a candidate for independent work-related functioning or job training. According to Dr. Oliveri, while a structured setting might be appropriate, independent work activity appeared unsuitable. (Tr. 608-13.)

On June 14, 2012, plaintiff was admitted to St. Vincent's DePaul Hospital due to suicidal ideation. He was discharged three days later on June 17, 2012, with a diagnosis of depressive disorder not otherwise specified and generalized anxiety disorder. On his discharge the attending physician listed plaintiff's GAF as 30.[6] (Tr. 542-63.)

On June 27, 2012, plaintiff had an MRI of his brain performed at the request of Dr. Stowell. The MRI showed some mild atrophy, but was otherwise unremarkable. (Tr. 760, 817.)

On November 29, 2012, plaintiff had a follow-up appointment with Dr. Smith for his chronic pain. Plaintiff reported following the methadone prescription and doing very well. This is consistent with his October 4, 2012, appointment with Dr. Smith where plaintiff reported doing better with the increased dosage of methadone and that his pain dissipates within 15 minutes. (Tr. 614-19.)

On January 22, 2013, Dr. Stowell provided a letter reporting what the signs and symptoms of a testosterone deficiency could be. However, she merely described the signs and symptoms. She did not specify plaintiff's impairment had resulted in those particular symptoms. (Tr. 842.)

---

[6] A GAF score between 21 and 30 indicates behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM IV at 34.

**ALJ Hearing**

The ALJ conducted a hearing on March 21, 2013. (Tr. 28-74.) Plaintiff appeared with his counsel present and testified to the following facts. Plaintiff is a fifty-one year old male with an eighth grade level of education. He lives with his wife and three children ages five, ten, and sixteen. Plaintiff worked as a hod carrier for twenty-seven years before being forced to stop working due to the pain in his back and the resulting inability to complete the tasks of his job.

Plaintiff testified that he constantly feels a stabbing pain in his lower back. He is prescribed methadone for the pain and it helps manage his pain. On a scale of one to ten, with ten being the worst pain and zero being no pain at all, plaintiff describes his pain level as five.

Plaintiff reasons that he is only able to sit for a half hour before having to get up and move around because of his lower back pain. He could stand for an hour before having to stop standing and could work for about thirty to forty-five minutes before having to stop.

In addition to his back pain, plaintiff credits his declining strength to his low testosterone levels. During his time as a hod carrier he was able to regularly lift and carry up and down ladders between one hundred twenty pounds and one hundred forty pounds of bricks. Yet, today he would only be able to lift ten pounds for about twenty-four minutes of an eight hour work day and he would be unable to climb a ladder.

Vocational Expert (VE) Denise Weaver testified at the hearing. She characterized plaintiff's last job under the general title of construction worker II. This job is considered by the Dictionary of Occupational Titles (DOT) as very heavy work and has a Specific Vocational Preparation level of two. (Tr. 68.)

The ALJ presented the VE with a hypothetical individual similar to plaintiff who has the same age, education, and heavy construction experience. This hypothetical individual would be able to lift and carry twenty pounds occasionally and ten pounds frequently. He could sit, stand, or walk a total of six hours each in an eight hour work day, would not be able to climb ladders, ropes, or scaffolding, could occasionally climb ramps or stairs, and can occasionally stoop, kneel, crouch, or crawl. Furthermore, the individual would not be able to work at an unprotected height or around hazardous machinery. He would be able to perform simple, routine, and repetitive tasks consisting of one or two step instructions and would be limited to work in a low stress environment. Additionally, the hypothetical individual would be limited to work that does not require the work ethic to be based on production standards involving numeric quotas or other

quantity metrics. This individual would be able to respond to supervision appropriately, and he would benefit from a limited social contact with co-workers or the public in that he only have occasional superficial non-confrontational, non-negotiation types of interactions with co-workers, supervisors, and the public. (Tr. 68-69.)

The VE testified that the hypothetical individual would be able to perform light work. Some examples of positions that are classified as light work are silver wrapper, bottling line attendant, or bagger, in the garment industry. None of those jobs would require production quotas, and generally the work focus is general work tasks, repetitive, simple work, and the jobs are without stress components. (Tr. 69-71.)

### III. DECISION OF THE ALJ

On April 9, 2013, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act. The ALJ found that plaintiff had the severe impairments of mild degenerative disc disease of the cervical, thoracic, and lumbar spine; sleep apnea; hypogonadism; attention deficit hyperactivity disorder (ADHD); and a cognitive disorder and short-term memory loss from remote history of traumatic brain injury. However, the ALJ found plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.)

The ALJ determined that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except with the limitations that plaintiff can only stand and walk for six hours in an eight hour work day; sit for six hours in an eight hour workday; and never climb ladders, ropes, or scaffolds. Plaintiff may, however, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, or crawl, but never work at unprotected heights or around hazardous machinery. In addition, plaintiff is limited to the performance of simple, routine, repetitious tasks with one or two-step instructions in a low-stress environment, which is defined as requiring few decisions. The ALJ also limited plaintiff to work that does not require the work output to be based on production standards involving numeric quotas or other time and quantity metrics. The ALJ further remarked that, although plaintiff can respond to supervision appropriately, he would benefit from limited social demands with coworkers or the public in that

he could have occasional superficial, non-confrontational, non-negotiation types of interactions with coworkers, supervisors, or the public.  (Tr. 14-15.)

The ALJ concluded that plaintiff's impairments would preclude him from performing his past work.  His work as a hod carrier was performed at a very heavy level and thus exceeds his RFC.  However, considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff could perform the required work of a silver wrapper, bottling line attendant, and bagger – garment industry.  These jobs exist in significant numbers in the national and local economy.  Accordingly, the ALJ found plaintiff not disabled under the Social Security Act.  (Tr. 22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeir v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three required plaintiff to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his condition meets or equals a listed impairment.  20 C.F.R. § 416.920(a)(4)(i)-(iii).  If plaintiff is not currently

working, has a severe impairment, but does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether or not plaintiff retains the RFC to perform past relevant work (PRW). Pate-Fires, 564 F.3d at 942. If, as here, the Commissioner determines plaintiff cannot return to PRW, the burden shifts to the Commissioner at Step Five to show plaintiff retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence in the record as a whole. Plaintiff asserts that the ALJ incorrectly weighed the medical opinion evidence. He also argues the RFC was determined incorrectly because the ALJ failed to provide sufficient limitations to account for plaintiff's impairments. The court disagrees.

1.      **Medical Opinion Evidence**

Plaintiff argues the ALJ erred in making the RFC assessment by giving more weight to Dr. Hutson, the non-examining physician, than the weight he gave to those physicians who regularly interacted with plaintiff.

When deciding if plaintiff is disabled, the ALJ is required to consider the medical opinions in the case record together with the rest of the relevant evidence received. See 20 C.F.R. § 404.1527(b). However, statements and opinions of physicians and other medical sources opining a plaintiff is disabled do not automatically require a finding of disability. 20 C.F.R. § 404.1527(e)(1). Rather, "the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). Moreover, in accordance with Social Security Ruling (SSR) 96-6p, ALJs are prohibited from ignoring the opinions from State agency medical and psychological consultants and, in certain circumstances, these opinions "may be entitled to greater weight than the opinions of treating or examine sources." SSR 96-6P, 1996 SSR LEXIS 3 at *6-7. Furthermore, the Eighth Circuit has regularly opined, "the ALJ is not free to ignore medical evidence but rather must consider the whole record." Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000). However, as the Eighth Circuit explained in Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004), the ALJ need not consider a physician's opinion as controlling when it is "inconsistent with other substantial evidence in the record." Additionally, the ALJ is

permitted to discredit some of the physicians' opinions when there are inconsistencies or contradictory evidence in the record. Weber v. Apfel, 164 F.3d 431, 432 (8th Cir. 1999).

In the case before the court today, it is without question the ALJ considered the whole record. The ALJ's decision specifically acknowledged the opinions of six physicians (Dr. Oliveri, Dr. Farzana, Dr. Hutson, Dr. Rucker, Dr. Stowell, and Dr. Smith). With regards to the opinion of Dr. Oliveri, the ALJ "has given it only partial weight." (Tr. 17.) Dr. Farzana's opinion from January 2012 was "given only partial weight . . ." (Tr. 18.) Although Dr. Rucker's opinion went further than the purview of his expertise, the ALJ gives "some weight " to his clinical findings. (Tr. 20.) Dr. Smith's opinion "is given only some weight." (Tr. 20.) The inconsistencies in Dr. Stowell's assessments and notes led the ALJ to give her 2012 letter "little weight." (Tr. 20.) And, although she provided no medical opinion, at least on one occasion, the ALJ referenced plaintiff being examined by Dr. Pan. (Tr. 17.)

Furthermore, when the ALJ sought to give less weight the opinion of Dr. Stowell he focused the analysis on what he determined as an inconsistency. He contrasted plaintiff's indication of feeling much better with his testosterone replacement therapy, having no more pain issues, and a great energy level, with plaintiff's request of Dr. Stowell to write a letter indicating his testosterone deficiency can cause fatigue. This contradiction between what the plaintiff reported and the request for a letter indicating fatigue led the ALJ to give Dr. Stowell's opinion little weight. (Tr. 20.)

With regard To Dr. Hutson's opinion, the ALJ indicated he reviewed and considered the finding of non-disability as a statement from a non-examining expert source. Following SSR 96-6P, the ALJ lawfully gave Dr. Hutson's opinion greater weight than the treating source medical opinions since his opinion was based on "the evidence of record, including careful consideration of the objective medical evidence and [plaintiff]'s allegations regarding symptoms and limitations." (Tr. 19.)

Not only did the ALJ properly consider all of the relevant opinion evidence in the case record, but he also appropriately weighed Dr. Hutson's non-examining opinion. The ALJ's decision included a detailed discussion of how the medical facts and non-medical evidence support his finding. (Tr. 15-21.) This analysis goes further than the requirements for developing the record. Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (clarifying that although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence

submitted); but cf. Taylor v. Barnhart, 333 F. Supp. 2d 846, 857 (E.D. Mo. 2004) (concluding that the combination of the evidence in the record and the ALJ's failure to explain his reliance on certain evidence to the exclusion of evidence to the contrary does not support the ALJ's opinion). Therefore, the court finds that the ALJ did properly assess the entire record when considering the plaintiff's impairments.

**2.      Residual Function Capacity and Credibility**

Plaintiff also argues the ALJ's RFC assessment was clearly against the weight of the evidence and that the RFC cannot be explained by citing plaintiff's lack of credibility.  Plaintiff further argues the RFC was in error because the ALJ failed to include sufficient limitations in his hypothetical question to the VE and in his RFC finding.

Because it bears indirectly on the issue of the RFC limitations, the court will first discuss the ALJ's RFC determination and his credibility finding.  As discussed earlier, at Step Four of the five-step regulatory framework used to determine whether an individual is disabled, the ALJ is required to assess plaintiff's RFC.  Pate-Fires, 564 F.3d at 942; see also, Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) (explaining that the RFC is determined at step four, where the burden of proof rests with the claimant).  RFC is a medical question, and the ALJ's determination of RFC must be supported by substantial evidence in the record.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2000); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a plaintiff can do despite his limitations, and is determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations.  Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545; see also, Depover v. Barnhart, 349 F.3d 563, 565 (8th Cir. 2003) (explaining that the RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence).  While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Furthermore, the ALJ's RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-6P, 1996 SSR LEXIS 3 at *19.

As plaintiff correctly states, the RFC is an important issue in a disability determination. Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 2005).  And, in this case, the ALJ determined

that regarding plaintiff's physical impairments he retained the capacity to perform light work as defined in the regulations, except with the limitations that he could only stand and walk for six hours in an eight hour work day and sit for six hours in an eight hour workday. The ALJ also found that plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. Plaintiff could never work at unprotected heights or around hazardous machinery. In accounting for plaintiff's mental impairments, the ALJ limited him to the performance of simple, routine, repetitious tasks with one or two-step instructions in a low-stress environment, which he described as requiring few decisions. The ALJ also limited plaintiff to work that does not require work output based on production standards involving numeric quotas or other time and quantity metrics. And further, although plaintiff can respond to supervision appropriately, the ALJ limited plaintiff to occasional, superficial, non-confrontational, non-negotiations types of interactions with coworkers, supervisors, and the public. (Tr. 14-15.)

In finding plaintiff capable of such work, the ALJ considered the record as a whole. The ALJ found plaintiff's allegations of impairment inconsistent with the record. His consideration of the subjective aspects of plaintiff's complaints comported with regulations and case law precedent. See generally, 20 C.F.R. § 404.1529 (explaining that when the ALJ determines whether a claimant is disabled, the ALJ is instructed to consider all symptoms, including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (explaining that the ALJ may not disregard subjective complaints solely because the objective medical evidence does not fully support them, but that subjective complaints may be discounted if there are inconsistencies in the evidence as a whole).

The ALJ's determination that plaintiff's statements concerning the intensity, persistence, and limiting effects of his medically determinable impairment were not entirely credible is supported by substantial evidence in the record. Regarding plaintiff's medical treatments, the ALJ noted that plaintiff's medication helped his various conditions. For example, his ADHD symptoms improved with medication (Tr. 17, 585, 866); use of a CPAP machine helped plaintiff's energy levels, he slept better, and generally felt better (Tr. 584, 614, 616, 618-19, 709); plaintiff's testosterone replacement therapy resulted in him feeling much better (Tr. 19-20, 286-89, 600, 624-25, 673, 705, 709); and, with methadone and epidural injections plaintiff

reported a decrease in pain and his doctors noted his pain was controllable and that he was doing very well (Tr. 19-20, 423-24, 600, 614-16, 618, 709, 862). See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (explaining that an impairment is not disabling if controlled by treatment or medication). Therefore, the ALJ properly determined plaintiff's improvement with medical treatment did not support the extent of his allegations.

The ALJ also considered plaintiff's daily activities in assessing his credibility. Plaintiff retained the ability to attend to his personal care needs without difficulty, to do laundry, to pay bills, count change, and use a checkbook or money orders. He has some pain completing yard work and, although he did not mention his impairments left him unable to fix meals, his wife cooks for him. The ALJ stated that plaintiff's daily activities are not limited to the extent expected, given the complaints of disabling symptoms and limitations. Cf. McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (explaining that reports of gardening, driving, and helping children get ready for school are inconsistent with reports of disabling pain). Consequently, the ALJ lawfully considered the inconsistencies between plaintiff's subjective allegations and the record as a whole in evaluating his credibility.

The ALJ similarly considered plaintiff's work history in assessing his credibility. Plaintiff was able to maintain consistent substantial gainful activity employment for an extended period of time despite the fact that his impairments then were the same or at least similar to what he now alleges as disabling. (Tr. 15-16, 18, 35-36, 38-39, 50, 54, 58-61, 154, 156-63, 165-82.) Cf. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (finding that inconsistencies between a plaintiff's subjective complaints and her activities diminish her credibility). Therefore, plaintiff's substantial work history while similarly impaired did not support his credibility.

Regarding to the limitations the ALJ imposed, when considering the ALJ's level of specificity in his opinion, and his detailed analysis, plaintiff's insufficient limitations argument fails. Plaintiff argues that the ALJ did "not include an off-task consideration in his RFC, close supervision consideration, or an absenteeism consideration." (Pl.'s Br. 13.) This is incorrect. Specifically, the ALJ wrote,

> Due to the effects of his mental impairments and symptoms of pain, fatigue, and possibly medication side effects, [plaintiff] is further limited to the performance of **simple**, **routine**, **repetitive tasks** with **one- or two-step instructions** in a **low-stress environment**, which is defined as requiring few decisions. The claimant is also limited to **work that does not require the work output be**

**based on production standards involving numeric quotas or other time and quantity metrics** and can respond to supervision appropriately.

(Tr. 21) (emphasis added).  Although it may not appear in the typical vernacular, the ALJ sufficiently accounts for plaintiff's limitations with the language provided in the RFC.

The court concludes that the ALJ lawfully evaluated plaintiff's credibility and found his allegations not credible.   The ALJ's RFC determination sufficiently included the proper limitations, and when the ALJ presented the VE with a hypothetical individual with a RFC ultimately identical to the one applied  to plaintiff, the ALJ included the limitations supported by medical evidence and other evidence.  Moreover, substantial evidence supports the ALJ's finding that plaintiff could perform a range of light, unskilled work.  (Tr. 22.)


## VI. CONSLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____
S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 18, 2015.